**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHNNY KARAM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PEPGEN INC., JAMES MCARTHUR, and NOEL DONNELLY,<br><br>Defendants. | Case No.: 1:25-cv-12007-ADB<br><br><u>CLASS ACTION</u> |

**LINDA HOFFMAN'S MEMORANDUM OF LAW IN FURTHER
SUPPORT OF HER MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND
APPROVAL OF SELECTION OF COUNSEL AND OPPOSITION
<u>TO COMPETING LEAD PLAINTIFF MOTIONS</u>**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ................................................................................................................... 4

    I.     The PSLRA Process ............................................................................................ 4

    II.    Mr. Karam Suffers from Unique Defenses and Should Not be Appointed Lead
         Plaintiff. ........................................................................................................ 5

    III.   The *De Minimis* Difference In Financial Interests Between Mr. Karam And Ms.
         Hoffman Is Attributable To Mr. Karam's Post-Disclosure Purchases ...................... 10

    IV.  Ms. Hoffman is the Presumptive Lead Plaintiff ................................................. 11

    A.    Ms. Hoffman Possesses the Largest Financial Interest of Any Movant. ...................... 11

    B.    Ms. Hoffman Satisfies Rule 23's Typicality and Adequacy Requirements. ................. 12

    C.    Approval of Ms. Hoffman's Choice of Counsel is Appropriate. ................................... 14

CONCLUSION ................................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berwecky v. Bear, Stearns & Co.*,
  197 F.R.D. 65, 69–70 (S.D.N.Y. 2000) ................................................................. 8

*Bibb v. Sesen Bio, Inc.*,
  No. 1:21-cv-07025-AKH, ECF No. 53 (S.D.N.Y. Aug. 19, 2021) ......................................... 11

*In re Boston Scientific Corp. Sec. Litig.*,
  708 F. Supp. 2d 110, 128 (D. Mass. 2010) ................................................................. 3

*Carvelli v. Ocwen Fin. Corp.*,
  No. 17-cv-80500, 2017 U.S. Dist. LEXIS 128862 (S.D. Fla. Aug. 14, 2017) ....................... 10

*In re Cavanaugh,*
  306 F.3d 726, 727 (9th Cir. 2002) ........................................................................ 5

*In re Cendant Corp. Litig.,*
  264 F.3d 201 (3d Cir. 2001)................................................................................ 12

*Coopersmith v. Lehman Bros., Inc.,*
  344 F. Supp. 2d 783, 793 (D. Mass. 2004) ......................................................... 1, 14

*In re Doral Fin. Corp. Sec. Litig.*,
  414 F. Supp. 2d 398, 403 (S.D.N.Y. 2006)............................................................ 10

*In re Elan Corp. Sec. Litig.*,
  No. 1:08-cv-08761, 2009 U.S. Dist. LEXIS 39859 (S.D.N.Y. May 11, 2009) ............... 10, 11

*Emerson v. Genocea Biosciences, Inc.*,
  Nos. 17-12137-PBS, et al., 2018 WL 839382 (D. Mass. Feb. 12, 2018) ........................ 1, 12

*Erickson v. Snap, Inc.*,
  No. 2:17-cv-03679-SVW-AGR (C.D. Cal. Sept. 18, 2017) .............................................. 7, 11

*Faris v. Longtop Financial Techs. Ltd.*,
  No. 11-cv-3658 (SAS), 2011 U.S. Dist. LEXIS 112970 (S.D.N.Y. Oct. 4, 2011)......... 2, 7, 10

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  903 F.2d 176, 180 (2d Cir. 1990)...................................................................... 2, 9

*George v. China Auto. Sys., Inc.*,
  2013 U.S. Dist. LEXIS 93698 (S.D.N.Y. July 3, 2013) ................................................. 8

*Jones v. Pfizer, Inc.*,
  No. 1:10-cv-03864-AKH, ECF No. 45 (S.D.N.Y. May 11, 2010) ........................................ 11

*Juliar v. SunOpta, Inc.*,
  08 Civ. 933 (PAC), et. al., 2009 U.S. Dist. LEXIS 58118 (S.D.N.Y. Jan. 30, 2009)............. 10

*Koenig v. Benson*,
  117 F.R.D. 330, 335-36 (E.D.N.Y. 1987)................................................................................ 8

*Leavitt v. Alnylam Pharms., Inc.*,
  378 F. Supp. 3d 60 (D. Mass. 2019) ...................................................................................... 13

*In re Lernout & Hauspie Sec. Litig.*,
  138 F. Supp. 2d 39, 46 (D. Mass. 2001) ................................................................................ 13

*Luongo v. Desktop Metal, Inc.*,
  Civil Action No. 1:21-cv-12099-IT, 2022 U.S. Dist. LEXIS 119570 (D. Mass. July 7,
  2022) ........................................................................................................................................ 3

*Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*
  649 F.3d 5 (1st Cir. 2011).......................................................................................................... 3

*In re Olsten Corp. Sec. Litig.*,
  3 F. Supp. 2d 286 (E.D.N.Y. 1998) ........................................................................................ 12

*In re Petrobras Sec. Litig.*,
  104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015)............................................................................. 7

*In re Pfizer Sec. Litig.*,
  233 F.R.D. 334, 338 (S.D.N.Y. 2005) .................................................................................... 10

*Police & Fire Ret. Sys. v. SafeNet, Inc.*,
  06 Civ. 5797 (PAC), 2007 U.S. Dist. LEXIS 97959 (S.D.N.Y. Feb. 21, 2007)……………..10

*Rocco v. Nam Tai Elecs., Inc.*,
  245 F.R.D. 131, 136 (S.D.N.Y. 2007) …………………………………………………..2

*In re Smart Techs., Inc. Sec. Litig.*,
  295 F.R.D. 50, 58 (S.D.N.Y. 2013) ........................................................................................ 3

*Union Asset Mgmt. Holding AG v. SanDisk Corp.*,
  No. 15-cv-01455-VC, 2016 U.S. Dist. LEXIS 15090 (N.D. Cal. Jan. 22, 2016).................... 9

*Vanderheiden v. Ubiquiti Networks, Inc. et al.*,
  No. 1:18-cv-01620-VM, ECF No. 21 (S.D.N.Y. Feb. 21, 2018)........................................... 11

*Winer Family Trust v. Queen*,
  503 F.3d 319, 323-25 (3d Cir. 2007) ...................................................................................... 9

iv

*ZSeven Fund, Inc. v. Motorcar Parts & Accessories*,
231 F.3d 1215, 1218 (9th Cir. 2000) ...................................................................................... 9

**Statutes**

15 U.S.C. § 78u-4 ........................................................................................................ *passim*

## PRELIMINARY STATEMENT

The Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4) (the "PSLRA"), sets forth a clear directive in terms of appointing lead plaintiffs to serve in securities fraud class actions. The PSLRA applies in the case at hand and, under the PSLRA, Ms. Hoffman's motion for appointment as lead plaintiff and selection of counsel should be granted.

The PSLRA presumes that the "most adequate plaintiff" is the movant that "has the largest financial interest in the relief sought by the class" *and* is otherwise adequate and typical should be appointed as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb); *See, e.g., Coopersmith v. Lehman Bros., Inc.*, 344 F. Supp. 2d 783, 793 (D. Mass. 2004) (appointing as Lead Plaintiff the movant with the largest financial loss); *Emerson v. Genocea Biosciences, Inc.*, Nos. 17-12137-PBS, et al., 2018 WL 839382, at *3 (D. Mass. Feb. 12, 2018) (loss is the most important factor in assessing financial interest). Here, that movant is Ms. Hoffman. As demonstrated in the table below, Ms. Hoffman suffered approximately $8,246.94 in losses in connection with her class period purchases of PepGen securities as a result of the Defendants' alleged fraud:

| Movant[1] | Gross Shares Purchased | Net Shares Retained | Net Funds Expended | Claimed Losses |
| --- | --- | --- | --- | --- |
| Johnny Karam | 4,000 | 4,000 | $15,600.00 | $9,135.00 |
| Linda Hoffman | 500 | 500 | $9,055.00 | $8,246.94 |
| Paul McHale | 600 | 600 | $3,330.00 | $2,361.71 |

---

[1] *See* Declaration re 20 Motion to Appoint Counsel and Appoint Lead Plaintiff by Linda Hoffman, Exhibit B- Loss Chart, Doc. No. 22-2; Affidavit in Support re 17 Motion to Appoint Counsel and Appoint Lead Plaintiff by Paul McHale, Exhibit 3- Loss Chart, Doc. No. 19-3; and Declaration re 23 Motion to Appoint Counsel and Lead Plaintiff by Johnny Karam, Exhibit A- Damages Analysis, Doc. No. 25-1.

Although competing movant, Mr. Karam, asserts an estimated loss that appears to be less than a thousand dollars more than the loss suffered by Ms. Hoffman —a truly *de minimis* difference—there are infirmities with Mr. Karam's trading that preclude his appointment as lead plaintiff. A review of Mr. Karam's transactions indicates that Mr. Karam purchased all of his PepGen shares on February 24, 2025, after three partial corrective disclosures alleged in the Action. Specifically, the disclosures made on July 30, 2024, December 16, 2024, and January 29, 2025. *See* Complaint, Doc. No. 1 at ¶¶ 7-12. Without the losses stemming from Mr. Karam's post-disclosure purchases, Ms. Hoffman possesses the greatest financial interest.

Mr. Karam's post-disclosure purchases raise potential concerns regarding his ability to adequately represent the proposed class. Not only will this present a significant standing issue if the class period is shortened, but numerous courts around the country have held that "a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative" or lead plaintiff. *See*, *e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 903 F.2d 176, 180 (2d Cir. 1990) (affirming denial of class certification where plaintiff "continued purchases of [securities] despite having notice of, and having investigated, the alleged fraud"); *Faris v. Longtop Financial Techs. Ltd.,* No. 11-cv-3658 (SAS), 2011 U.S. Dist. LEXIS 112970, at *28 (S.D.N.Y. Oct. 4, 2011) ("These post-disclosure purchases suggest that these three members invested in Longtop securities notwithstanding notice of defendants' misstatements and omissions. These unusual trading patterns may well undermine the ability of these three members to assert the fraud-on-the-market presumption of reliance, thereby rendering them inadequate class representatives."); *Rocco v. Nam Tai Elecs., Inc*., 245 F.R.D. 131, 136 (S.D.N.Y. 2007) ("it has been recognized that a 'named plaintiff who is subject to an arguable defense of non-reliance on

2

the market has been held subject to a unique defense, and therefore, atypical of the class under Rule 23(a)(3)'")..

Thus, where the truth becomes known *prior* to a purchase, a shareholder cannot later claim to have sustained damages in connection with those shares. *See In re Boston Scientific Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 128 (D. Mass. 2010) *aff'd sub nom. Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 649 F.3d 5 (1st Cir. 2011) (noting that "'even if fraudulent statements were made in attempt to manipulate the market price of a security, if corrective information credibly entered the market and dissipated the effects of the misstatements, those who traded [defendant's] shares after the corrective statements would have no direct or indirect connection with the fraud'") (internal quotations omitted); *In re Smart Techs., Inc. Sec. Litig.*, 295 F.R.D. 50, 58 (S.D.N.Y. 2013) ("Any investor who purchased after the November 9 corrective disclosure would have known of the alleged 'untruth or omission at the time of his or her acquisition of the security,' and thus, that his or her claims would be incongruous with plaintiff's (who purchased prior to the November 9 corrective disclosure--i.e., without such knowledge)." Defendants will likely jump at the opportunity to exploit this weakness at class certification and during trial, thereby jeopardizing the interests of the class. The foregoing issue disqualifies Mr. Karam from consideration.

Once Mr. Karam is disqualified, there can be no dispute that Ms. Hoffman holds the "largest financial interest" in the Action and is, therefore, presumptively the "most adequate plaintiff" for the purpose of serving as lead plaintiff pursuant to the PSLRA. 15 U.S.C. § 78u-4(a)(3)(B). Her significant financial interest in this litigation ensures that she will vigorously pursue recovery on behalf of the Class. *See Luongo v. Desktop Metal, Inc.*, Civil Action No. 1:21-cv-12099-IT, 2022 U.S. Dist. LEXIS 119570, at *16 (D. Mass. July 7, 2022) (finding that movant

3

"has sustained significant financial losses, the court finds that she has incentive to maximize the recovery from the alleged fraud and her claims do not conflict with those asserted on behalf of the class."). As none of the competing movants can rebut this presumption with proof that Ms. Hoffman is somehow atypical or inadequate, Ms. Hoffman is entitled to be appointed as the lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Accordingly, for these reasons, Ms. Hoffman respectfully requests that the Court grant her motion in its entirety and deny the competing motions.

**ARGUMENT**

### I.    The PSLRA Process.

The PSLRA sets forth the procedure for the selection of a lead plaintiff in "each private action arising under [the Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. §78u-4(a)(1). Following the required notice announcing the class action, class members interested in serving as lead plaintiff are required to file a motion seeking appointment within 60 days thereafter. 15 U.S.C. §78u-4(a)(3)(A)(i). From the movants that file timely motions, the presumptive "most adequate plaintiff" is the "person or group of persons" that "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. §78u-4(a)(3)(B)(iii)(I).

After a presumptively most adequate plaintiff is identified, the Court must then determine if the presumption has been rebutted through "proof" by a member of the purported plaintiff class that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately

representing the class." 15 U.S.C. §78u-4(a)(3)(B)(iii)(II). If the presumption is not rebutted, the presumptively most adequate plaintiff should be appointed as lead plaintiff.

Importantly, and relevant to the motion at bar, if the movant with the "largest financial interest" either fails to "satisf[y] the requirements of Rule 23" or is otherwise at risk of being "subject to a unique defense[]" such that the presumption of "most adequate plaintiff" is rebutted, then that movant is disqualified and the analysis is performed again beginning with the movant with the next "largest financial interest" in the litigation. *See In re Cavanaugh*, 306 F.3d 726, 727 (9th Cir. 2002) ("The court must examine potential lead plaintiffs one at a time, starting with the one who has the greatest financial interest, and continuing in descending order if and only if the presumptive lead plaintiff is found inadequate or atypical."). Mr. Karam's post-disclosure purchases of PepGen stock subject him to unique defenses, raising potential challenges to his ability to satisfy Rule 23's typicality and adequacy requirements. Here, the most adequate class representative is Ms. Hoffman.

## II.    Mr. Karam Suffers from Unique Defenses and Should Not be Appointed Lead Plaintiff.

Mr. Karam's greater financial interest rests on purchases that he made after three partial corrective disclosures. Indeed, the complaint in the Action alleged that the "truth" regarding Defendants' fraud began to emerge on July 30, 2024. *See* Complaint, Doc. No. 1 at ¶ 7. On this date, PepGen issued a press release touting its "positive clinical data from the first dose cohort (5 mg/kg) of PGN-EDO51" in its ongoing CONNECT1 study. *Id*. The Company reported that "PGN-EDO51 achieved a mean absolute dystrophin level of 0.61% of normal and a 0.26% change from baseline after 4 doses, measured at week 13 by Western blot analysis." *Id*. However, a Stifel analyst noted, "the magnitude of dystrophin increase was below what [PepGen] anticipated, which is

5

disappointing[.]" *Id*. A Leerink Partners analyst noted that the low dose missed PepGen's expectations of 1% or greater dystrophin expression. *Id*. Following this news, PepGen's stock price fell $5.55 per share, or 32.69%, to close at $11.43 per share on July 31, 2024. *Id.* at ¶ 8.

The next corrective disclosure occurred on December 16, 2024, when PepGen issued a press release announcing that it had received a clinical hold notice from the FDA regarding an Investigational New Drug ("IND") application "to initiate the [CONNECT2] clinical trial in patients with [DMD]" in the U.S. *Id.* at ¶ 9. The FDA's issuance of a clinical hold notice for the IND application indicated that the FDA had concerns regarding risks posed to patients in the CONNECT2 study and/or there were other deficiencies associated with the study. *Id.* On this news, PepGen's stock price fell $0.17 per share, or 3.63%, to close at $4.51 per share on December 16, 2024. *Id.* at ¶ 10.

The third corrective disclosure occurred on January 29, 2025, when PepGen issued a press release providing updates regarding safety concerns observed in the CONNECT1 study and the FDA's concerns regarding the CONNECT2 study. *Id.* at ¶ 11. With respect to the CONNECT1 study, the press release stated, that "[d]osing of one of the[] . . . participants [in the 10 mg/kg cohort] was paused due to a reduction of his estimated glomerular filtration rate[.]" *Id.* In addition, PepGen "ha[d] received communication from Health Canada . . . request[ing] additional information from the Company to address Health Canada's safety concerns before any further dose escalation or enrollment of any additional participants at the current dose levels." *Id.* With respect to the CONNECT2 study, the same press release stated, in relevant part, that "[t]he Company is working with the FDA to address its questions regarding supportive data for the dosing levels planned for the patient population." *Id.* Following these disclosures, PepGen's stock price fell $0.40 per share, or 21.74%, to close at $1.44 per share on January 30, 2025. *Id.* at ¶ 12. Despite

6

the clear implications, Mr. Karam purchased all of his PepGen shares on February 24, 2025. *See* ECF No. 25-1, Mr. Karam's Damages Analysis.

The final corrective disclosure occurred on March 4, 2025 when PepGen issued a press release "announc[ing] its voluntary decision to temporarily pause the [CONNECT2] study . . . until the Company can review results from the 10 mg/kg cohort in the ongoing [CONNECT1] study." *See* Complaint, Doc. No. 1 at ¶ 13. On this news, PepGen's stock price fell $0.53 per share, or 18.86%, to close at $2.28 per share on March 4, 2025. *Id*. at ¶ 14.

Mr. Karam's post-disclosure purchases of PepGen stock subject him to unique defenses "that render [Mr. Karam] incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb). In *Erickson, v. Snap, Inc*., a potential lead plaintiff made several purchases of its shares after an initial corrective disclosure, but before a subsequent disclosure. Order re Mots. to Consolidate & Mots. to Appointment of Lead Plaintiff & Approval of Selection of Counsel, *Erickson, v. Snap, Inc*., No. 2:17-cv-03679-SVW-AGR (C.D. Cal. Sept. 18, 2017), ECF No. 54, at 4. The district court found the purchases sufficient to rebut the presumption that the plaintiff was the "most adequate" one. *See id.* Here, "'[t]hese post-disclosure purchases suggest that [Mr. Karam] invested in [PepGen] securities notwithstanding notice of defendants' misstatements and omissions' and undermine 'the ability of [Mr. Karam] to assert the fraud-on-the market presumption of reliance, thereby rendering [it an] inadequate class representative.'" *See id.* (quoting *Faris*, 2011 U.S. Dist. LEXIS 112970, at *28). As a result, courts have found that such trading renders a plaintiff atypical. *See*, *e.g.*, *In re Petrobras Sec. Litig*., 104 F. Supp. 3d 618, 623 (S.D.N.Y. 2015) (rejecting lead plaintiff movant because, among other reasons, it purchased after partial disclosures were made and shortly before the close of the class period, and those "transactions raise serious questions regarding [the movant's] reliance on the alleged

7

misrepresentations and omissions"); *see also Koenig v. Benson,* 117 F.R.D. 330, 335-36 (E.D.N.Y. 1987) ("there is a concern if a named plaintiff is subject to 'unique defenses' concerning his individual reliance, then attention will be diverted away from issues common to the class. This would impair his ability to act as a representative for the class. Also, questions of individual reliance may place the materiality of the alleged misrepresentations into doubt [citations omitted]."); *Berwecky v. Bear, Stearns & Co.,* 197 F.R.D. 65, 69–70 (S.D.N.Y. 2000) (declining to appoint certain plaintiffs as class representatives because they engaged in post-disclosure purchases and were therefore subject to unique defenses).

Should he be appointed as Lead Plaintiff, Mr. Karam's post-disclosure purchases would surely be a focal point of Defendants' attacks at class certification and/or trial. For example, Defendants would question whether Mr. Karam relied upon Defendants' alleged misrepresentations. Mr. Karam would be unable to deny that, under the facts of this case, he purchased shares shortly after the third alleged disclosure of that fraud, undermining the foundational theory of the Action. These attacks would threaten the Action and the class as a whole. Courts around the country have rejected proposed class representatives, or denied class certification altogether, on this very basis. *See*, *e.g.*, *George v. China Auto. Sys., Inc.,* 2013 U.S. Dist. LEXIS 93698, at *18 (S.D.N.Y. July 3, 2013) (denying class certification where proposed class representatives bought shares post-disclosure, stating that "this will require that each of the named plaintiffs expend considerable time on unique defenses—precisely the situation the case law does not condone").

Mr. Karam's time of purchase will also pose an issue if the Class Period is eventually shortened. Unlike Ms. Hoffman, who purchased her PepGen shares in the middle of the Class Period, Mr. Karam made his only purchase towards the end. *Compare* ECF Nos. 19-3 and 22-2.

8

Mr. Karam could jeopardize class certification and force the re-opening of the lead plaintiff process. *See Union Asset Mgmt. Holding AG v. SanDisk Corp.,* No. 15-cv-01455-VC, 2016 U.S. Dist. LEXIS 15090, at *15 (N.D. Cal. Jan. 22, 2016) (inviting "motion[s] asking the Court to reconsider its prior order appointing the current lead plaintiffs" in light of court's motion to dismiss decision and determination the shorter class period was "far more realistic"); *ZSeven Fund, Inc. v. Motorcar Parts & Accessories*, 231 F.3d 1215, 1218 (9th Cir. 2000) ("the district court's order designating a lead plaintiff . . . can be revisited if circumstances warrant"). That delay and uncertainty can be avoided entirely here by appointing Ms. Hoffman. The *Winer* case is particularly instructive. In that case, the plaintiff lost standing to pursue claims after the court dismissed claims based on misrepresentations occurring in the first part of class period. *Winer Family Trust v. Queen*, 503 F.3d 319, 323-25 (3d Cir. 2007). Mr. Karam's dependence on the March 4, 2025 corrective disclosure exposes him to a "unique defense." Defendants will argue that the decline in PepGen's stock price following the disclosure was unrelated to the alleged fraud. If that argument is successful, then Mr. Karam will not have any recoverable losses for the reasons described above. He will also not have standing to pursue claims on behalf of the class. *See Gary Plastic Packaging Corp.*, 903 F.2d 176, 180 ("[r]egardless of whether the issue is framed in terms of the typicality of the representative's claims or the adequacy of its representation, there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."). Thus, Mr. Karam is uniquely motivated to preserve and prioritize the March 4, 2025 corrective disclosure above all other issues in this case and, for that reason, cannot serve as the lead plaintiff.

Under these circumstances, appointing Mr. Karam as Lead Plaintiff would place the interests of the entire class at unreasonable risk. This risk is entirely unnecessary here, given that

9

Ms. Hoffman possesses a financial interest in the outcome of the litigation that is virtually identical to Mr. Karam's, and does not suffer from the same debilitating trading issues. *See Faris,* 2011 U.S. Dist. LEXIS 112970, at *28 ("this Court sees no reason to subject the class to this potential defense where there is another movant" that does not suffer from the same potential unique defenses arising from post-disclosure trading). Mr. Karam is thus not the movant that is "most capable of adequately representing the interests of class members," 15 U.S.C. § 78u-4(a)(3)(B)(i)), and his Lead Plaintiff motion should be denied.

### III. The *De Minimis* Difference In Financial Interests Between Mr. Karam And Ms. Hoffman Is Attributable To Mr. Karam's Post-Disclosure Purchases

The issues raised above can be avoided entirely here, given that Ms. Hoffman did not make post disclosure purchases and her losses are nearly identical to Mr. Karam's: $9,135.00 versus $8,246.94 (a de minimis difference of $888). Such a "slight difference" should not "dictate such an important result." *Police & Fire Ret. Sys. v. SafeNet, Inc.*, 06 Civ. 5797 (PAC), 2007 U.S. Dist. LEXIS 97959, at *6 (S.D.N.Y. Feb. 21, 2007) ($40,000 difference in losses is a "very slight difference" that "cannot dictate such an important result"); *see also Juliar v. SunOpta, Inc.*, 08 Civ. 933 (PAC), et. al., 2009 U.S. Dist. LEXIS 58118, at *9 (S.D.N.Y. Jan. 30, 2009) (finding $30,000 difference between movants' losses to be "minimal"); *Carvelli v. Ocwen Fin. Corp.*, No. 17-cv-80500, 2017 U.S. Dist. LEXIS 128862, at *7 (S.D. Fla. Aug. 14, 2017); *accord In re Elan Corp. Sec. Litig.*, No. 1:08-cv-08761, 2009 U.S. Dist. LEXIS 39859, at *4 (S.D.N.Y. May 11, 2009) (appointing movant with smaller loss because a difference of approximately $653,000 or 15% was "basically equal"); *In re Doral Fin. Corp. Sec. Litig.*, 414 F. Supp. 2d 398, 403 (S.D.N.Y. 2006) (finding losses of $2.3 million and $1.9 million, or 17% to be "roughly equal"); *In re Pfizer Sec. Litig.*, 233 F.R.D. 334, 338 (S.D.N.Y. 2005) (considering $22.8 million and $22.4 million as

10

"roughly equal"); *Bibb v. Sesen Bio, Inc.*, No. 1:21-cv-07025-AKH, ECF No. 53 at p. 2 (S.D.N.Y. Aug. 19, 2021) (citing *Jones v. Pfizer, Inc.*, No. 1:10-cv-03864-AKH, ECF No. 45 at 20 (S.D.N.Y. May 11, 2010) (finding that difference in loss between two movants of less than 10% is "virtually the same . . . [t]here is no point in making distinctions") and *In re Elan Corp. Sec. Litig.*, No. 1:08-cv-08761-AKH, 2009 U.S. Dist. LEXIS 39859, at *5 (S.D.N.Y. May 11, 2009) (noting that "movants' losses are basically equal" where one claimed a loss of $4,236,002.68 and another movant claimed a loss of $4,257,795.45)). *See also Vanderheiden v. Ubiquiti Networks, Inc. et al.,* No. 1:18-cv-01620-VM, ECF No. 21 at pp. 1-4 (S.D.N.Y. Feb. 21, 2018) ("While several courts consider financial loss to be the most important factor, that analysis changes when the movants' losses are roughly equal").

When Mr. Karam's post-disclosure purchases are removed from the calculation, Ms. Hoffman actually possesses the larger estimated loss. Moreover, in contrast to Mr. Karam's flawed trading pattern, Ms. Hoffman purchased all of her PepGen shares prior to the first corrective disclosure. Under similar circumstances, courts have not hesitated to appoint as lead plaintiff the investor whose purchases are not subject to any challenges. *See, e.g.*, *Erickson*, ECF No. 54, at 6 (holding that "[t]here is no reason to subject the class to these unique defenses when a non-conflicted candidate for Lead Plaintiff is also before the Court," and noting that the competing movants' pre-disclosure losses were "fairly close").

IV.    **Ms. Hoffman is the Presumptive Lead Plaintiff**

A.  **Ms. Hoffman Possesses the Largest Financial Interest of Any Movant.**

While the PSLRA does not explain how to calculate the greatest financial interest in the relief sought by the class, courts throughout the country typically examine "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class

11

period; (3) the total net funds expended during the class period; and, most importantly, (4) the approximate losses suffered during the class period." *Emerson*, 2018 WL 839382, at *3 (citing *In re Olsten Corp. Sec. Litig.,* 3 F. Supp. 2d 286, 295). Further, Courts in the First Circuit recognize that the amount of financial loss is the most significant factor to be considered. *See Emerson*, 2018 WL 839382, at *3 (losses are the most important factor).

Ms. Hoffman has the largest financial interest in the relief sought by the Class, suffering the greatest loss by nearly $6,000 compared to the closest remaining movant.

| Movant | Gross Shares Purchased | Net Shares Retained | Net Funds Expended | Claimed Losses |
|---|---|---|---|---|
| Johnny Karam | 4,000 | 4,000 | $15,600.00 | $9,135.00 |
| Linda Hoffman | 500 | 500 | $9,055.00 | $8,246.94 |
| Paul McHale | 600 | 600 | $3,330.00 | $2,361.71 |

As demonstrated above, it is clear that Ms. Hoffman possesses the largest financial interest of any remaining movant before the Court under the most important factor, as she suffered the largest loss out of all remaining movants. Therefore, Ms. Hoffman has the largest financial interest.

### B.  Ms. Hoffman Satisfies Rule 23's Typicality and Adequacy Requirements.

Pursuant to the PSLRA, in addition to possessing the largest financial interest in the outcome of the litigation, the lead plaintiff must also make the requisite *prima facie* showing that he satisfies the typicality and adequacy requirements of Rule 23. *See Emerson*, 2018 WL 839382, at *3 n.2 (requiring a "prima facie showing of typicality and adequacy") (citing *In re Cendant Corp. Litig.,* 264 F.3d 201, 263 (3d Cir. 2001)). Ms. Hoffman has gone beyond making the prima facie showing of the typicality and adequacy requirements of Rule 23, thus triggering the statutory presumption of lead plaintiff in her favor.

Ms. Hoffman purchased and retained 500 PepGen shares during the Class period, in the same manner as all other Class members, and holds no interest adverse to the rest of the class. *See*

12

Doc. Nos. 22-1, 22-2, and 21 at p. 9. "A plaintiff's claim is typical if it arises from 'the same events or course of conduct' and involves the same legal theory as the claims of the rest of the class members." *Leavitt v. Alnylam Pharms., Inc.,* 378 F. Supp. 3d 60, 65 (D. Mass. 2019) (quoting *In re Lernout & Hauspie Sec. Litig.*, 138 F. Supp. 2d 39, 46 (D. Mass. 2001)). Ms. Hoffman is more than qualified to represent the Class with an impressive educational background with a Bachelor of Science and Business Administration in Finance. *See* Declaration re 20 Motion to Appoint Counsel and Appoint Lead Plaintiff by Linda Hoffman, Exhibit D- Declaration of Linda Hoffman, Doc. No. 22-4. Ms. Hoffman resides in Fort Lauderdale, Florida. *Id*. She is currently employed as an on-site Luxury Real Estate Developer Sales Executive for Related Group. *Id*. Ms. Hoffman is a sophisticated investor with 38 years of investing experience. *Id*. Further, she has experience overseeing attorneys, as she has hired attorneys for a civil rights matter. *Id*. Since Ms. Hoffman has the largest financial interest in the relief sought by the Class and otherwise satisfies Rule 23, she is the presumptive "most adequate plaintiff" of the Class within the meaning of the PSLRA.

To overcome the strong presumption entitling Ms. Hoffman to appointment as Lead Plaintiff, the PSLRA requires "***proof***" that the presumptive Lead Plaintiff is inadequate. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (emphasis added). This the competing movants cannot do. No such proof exists to rebut the presumption in favor of Ms. Hoffman, nor is she subject to a unique defense that would otherwise detract attention from the allegations of the Action.

Accordingly, as Ms. Hoffman has the largest financial interest in the litigation and satisfies the adequacy and typicality requirements of Rule 23, she is entitled to the presumption of being the "most adequate plaintiff" to represent the Class.

### C. Approval of Ms. Hoffman's Choice of Counsel is Appropriate.

The PSLRA provides that "the most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *Coopersmith*, 344 F. Supp. 2d 783, 793 (quoting 15 U.S.C. § 78u–4(a)(3)(B)(v)). The Court should interfere with the lead plaintiff's selection of counsel only when necessary "to protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa). Ms. Hoffman selected and retained Levi & Korsinsky to serve as Lead Counsel for the Class. Levi & Korsinsky has extensive experience in successfully prosecuting complex securities class actions such as this one and is well-qualified to represent the Class. *See* Declaration re 20 Motion to Appoint Counsel and Appoint Lead Plaintiff by Linda Hoffman, Exhibit E- Levi & Korsinsky, LLP Firm Resume, Doc. No. 22-5. Thus, the Court should approve Ms. Hoffman's choice of counsel.

### CONCLUSION

For the foregoing reasons, Ms. Hoffman respectfully requests that the Court grant her Motion and enter an Order: (1) appointing Ms. Hoffman as Lead Plaintiff, (2) approving her selection of Levi & Korsinsky, LLP as Lead Counsel for the Class, and (3) granting such other relief as the Court may deem just and proper.

Dated: August 22, 2025                                Respectfully Submitted,

                                                      */s/ Shannon L. Hopkins*
                                                      Shannon L. Hopkins (BBO# 657485)
                                                      **LEVI & KORSINSKY, LLP**
                                                      1111 Summer Street, Suite 403
                                                      Stamford, Connecticut 06905
                                                      Tel. (203) 992-4523
                                                      Fax: (212) 363-7500
                                                      E-mail: shopkins@zlk.com

14

**LEVI & KORSINSKY, LLP**
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Counsel for Movant Linda Hoffman and*
*Proposed Lead Counsel for the Class*

15

## CERTIFICATE OF SERVICE

I, Shannon L. Hopkins, certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing on August

22, 2025.

Dated: August 22, 2025                          /s/Shannon L. Hopkins
                                                Shannon L. Hopkins

16